[Civ. No. 17602.   First Dist., Div. One.   July 31, 1958.]

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, Appellant, v. CALIFORNIA BUILDING MAINTENANCE COMPANY (a Corporation), Respondent.

Dion R. Holm, City Attorney (San Francisco), and George E. Baglin, Deputy City Attorney, for Appellant.

Frederic G. Nave, Boyd & Taylor and Boyd, Taylor, Nave & Flageollet for Respondent.

PETERS, P. J.—The San Francisco Unified School District appeals from a judgment of nonsuit rendered in favor of the California Building Maintenance Company.

The record shows that the maintenance company had a written contract with the city of San Francisco to wash the windows of many of the public buildings located in the city, including the windows of all of the city high schools. One Richard Dubay was employed by the maintenance company as a window washer. Dubay, while washing the windows in Galileo High School, fell and was injured when the window he was washing came loose from its fastenings. The insurance carrier of the maintenance company paid Dubay compensation benefits. Subsequently Dubay and this insurance carrier brought an action against the school district, alleging that it had failed to supply Dubay with a safe place in which to work. Judgments totaling over $30,000 were recovered by the two plaintiffs in that action. These judgments were satis-

fied by the school district paying the two plaintiffs the sum of $25,000. These judgments are final and their validity is not involved on this appeal. These judgments necessarily decided that, as between Dubay and the school district, the latter had been negligent in failing to supply Dubay a safe place in which to work.

The present action by the school district against the maintenance company seeks to recover from the maintenance company the $25,000 paid to settle the judgments of Dubay and the insurance company, and also to recover $2,151.86 expended by the school district in defending against the Dubay action. The present action is one for damages for breach of contract, that is, to recover damages caused by the maintenance company's claimed breach of its contract with the school district. The theory of the action is that the maintenance company permitted Dubay to wash the window in question without adequate safety equipment and in a manner in direct violation of the terms of its contract with the school district. The maintenance company in its answer alleged as a first defense that the Dubay action necessarily determined that the school district was negligent; that such negligence was a proximate cause of the accident to Dubay; that Dubay was not contributively negligent; that such determinations were res judicata in this action, and that such determinations bar any recovery in the present action under the common law principle that one joint tort feasor cannot secure contribution from the other. The second defense alleged was that the Workmen's Compensation Act provides the exclusive remedy of an employee against his employer for injuries received in the course and arising out of the employment, and that to permit the school district to recover in this action would be to impose on the maintenance company, indirectly, liability for injuries to its employee, Dubay. The trial court granted the motion for a nonsuit.

The contract between the school district and the maintenance company was based upon the acceptance of a competitive bid whereby the maintenance company contracted and agreed to wash the windows of many of the public buildings in San Francisco for an agreed price. One of the buildings specified was the Galileo High School, a building equipped with the Hauser type of window sash. The contract contains several provisions here relevant. It required the maintenance company to "furnish all labor, materials, and equipment necessary to perform in a first-class manner the work out-

lined." It also provided that in school buildings all exterior windows should be "cleaned inside and outside." Of particular importance is the specific provision that: "In all schools that have Hauser window sashes, stepladders must be used from inside." It is also provided that: "All windows broken by cleaners are to be replaced at the expense of the Contractor, and the Contractor is held responsible for payment of any and all damages resulting from his operations."

There is ample evidence in the record to support a finding that the maintenance company breached this contract in the manner in which it permitted its employees to wash the windows in Galileo High School, and to support a finding that the injuries to Dubay were caused, at least in part, by such breach.

On the day Dubay was injured he was washing windows at Galileo High School. This school is equipped with Hauser windows. This is an awning-type, reversible window, about 5 feet in height. It opens from the bottom. The top of the window is held to the window frame by two wing bolts. Each bolt screws into a metal plate attached to the sash by three wood screws. The wing portion of each bolt rests in a slot attached to each side of the window frame. The window may be opened from the bottom and completely reversed. As the window is opened the wing portions of the two wing bolts slide down in the slots. As additional support for the window when opened, on each side of the sash, there is a metal arm, one end attached to the middle of the sash, the other to the bottom side of the window frame. As the top of the window comes down and the window reverses, the window pivots on these metal arms and on the wing bolts. The window is reversed by pushing it to a horizontal position and then hooking the end of a window pole over the bottom edge of the window and then bearing down on the pole.

Dubay testified that he pulled the window upon which he was working into a horizontal position. He then washed the window by standing on the sill and leaning out over the window. At the time of the accident his right foot was not on the sill and considerable of his weight was on the window. The wing nut sheered off when he placed his weight on the window. This caused the entire window to fall out and Dubay fell to the ground two stories below. Dubay also testified that his foreman, a Mr. Keough, did not instruct him to use a stepladder in washing these windows, nor did Keough ever give him a safety line to use while washing the windows. Du-

bay had not been instructed not to lean or put his weight upon a horizontally pivoted window, nor had he been instructed to use a safety device when standing or sitting on a window sill.

Keough, the foreman in charge of window cleaning for the maintenance company, testified that it was his duty to supply the equipment needed by the washers to perform the job in a safe manner. Mr. Vaughan was his superior. Keough was told to clean the windows and that the washers should use stepladders from the inside in washing Hauser windows. In general, he knew of the contract provisions. He also knew the safety rules applicable, and knew that his employer was required to comply with them. He knew that the safety rules required that a window washer use a safety belt and line tied to a radiator when working on a window sill from certain positions, and he admitted that he never furnished Dubay with a belt or line. He also admitted that he never told Dubay to use the safety devices required by the rules, nor did he tell him to use a stepladder in washing Hauser windows. He knew that Dubay did not use safety devices or a stepladder. Although he was not present when Dubay fell, he knew how the windows had been washed in the past. He knew that the washer customarily leaned out from the sill with his weight upon the window to wash it, and at the time of the accident did not know that this was not proper because the windows had always been washed in that fashion. When asked as an expert on window washing whether it would not have been safer for the men, if they were to wash the windows in this fashion, to tie themselves to the radiator, he stated that it would have been.

On the other hand, Keough testified at the time of trial that it was not customary for washers of Hauser windows to use a safety line, although in a deposition he had stated that that was the custom. In his opinion it would not be safe to wash a Hauser window from a stepladder because the ladder would be too far from the window. He also stated that it was not practical for the washer to tie himself to a radiator. He admitted that he knew that he was supposed to carry out the terms of the contract, and that he knew that the terms of the contract were not being carried out. He testified that he reported to his superior, Mr. Smith, and probably to Mr. Vaughan, that ladders were not being used "because we couldn't work off of them."

Vaughan, general manager and vice-president of the maintenance company, denied that it was his function to give orders

to Keough, that being the duty of Mr. Elliot, manager of the San Francisco division of the company, and denied knowing how the windows were washed. He admitted, however, knowing that it was the general practice for the washer to lower the window into a horizontal position, lean over it and wash it with his weight on the window.

A fellow workman of Dubay had washed windows at this high school and had never encountered a window not in good working condition. He was never told to wash Hauser windows from the inside from a ladder. On prior occasions he had not used a ladder or a safety line while washing such windows.

There was ample evidence that it was practical to wash the windows from the inside while on a ladder, and that it was the proper thing to use a safety line if the window was washed while the washer stood on the sill. A former safety engineer for the Division of Industrial Safety so testified, and also testified that the method used by Dubay was not a safe method because the pivot rod on the window is not constructed to support the weight of a man.

In the first trial and in this trial the evidence was to the effect that the threads of one of the wing nuts on the window being washed by Dubay were partially stripped. The fellow workman, after the accident, discovered that this wing bolt had sheered off so that the entire frame of the window gave way when Dubay's weight was put upon it. Joseph Russell, a civil engineer employed by the State Division of Industrial Safety as a construction safety engineer, investigated the accident. He found the window in question hanging on the outside of the building supported by the lever arms. He found the wing nut that had given way and concluded that it had been torn loose by a force which pulled the lug out of its threads, and which also tore the slot. In his opinion the three threads closest to the shoulder were not screwed into the plate upon the sash. The condition of the window was, in his opinion, one of the causes of the accident. He also believed that it would be desirable for the window washer, if he washed the window from the sill, to attach himself to some object in the room.

On this evidence the jury could have found that the maintenance company was negligent in permitting Dubay to wash the windows by standing on the window sill without safety equipment. The holding in the prior case and the evidence in this

one shows that the school district was negligent in failing to supply to Dubay a safe place in which to work. It is also clear that the evidence is sufficient to show that the maintenance company breached its contract with the school district when it failed to furnish its window washers stepladders and failed to require the washers to use ladders while washing Hauser windows. The question presented is whether or not, under such circumstances, the school district, having been compelled to pay Dubay damages, may seek indemnity from the maintenance company, Dubay's employer, when the evidence is sufficient to show that the maintenance company was not only negligent but guilty of a breach of contract in the manner in which it performed its contract obligations.

This type of problem has come before the courts on several occasions. There are quite a number of cases permitting the third party to recover under such circumstances from the one who breached the contract, even in the absence of an express contract of indemnification. The precise theory upon which recovery is permitted in such cases is not too clear. Some cases, as we shall see, treat the third party and the contract breaker as joint tort feasors, but permit recovery by one joint tort feasor from the other by creating an exception to the rule of noncontribution, finding that the parties are not *in pari delicto,* or that the third party is guilty of only "passive" or "secondary" negligence while the employer is guilty of "active" or "primary" negligence. Other cases hold that the contract between the third party and the contract breaker amounts to an implied contract to indemnify, and that the contract breaker is liable on this implied contract and that in such cases the noncontribution rule has no application.

Before discussing these cases there are several issues presented that should first be discussed. The maintenance company maintains that it cannot be liable to the school district because the Workmen's Compensation Act provides the exclusive remedy of an injured employee against his employer, and that if the employer were compelled to pay the school district the damages paid by that district to Dubay, then Dubay would be indirectly recovering from his employer in a tort action. The employer, of course, is not liable to its employee in tort.

This precise problem has not been directly passed upon by the California courts, but the Supreme Court has decided an analogous problem. In *Baugh* v. *Rogers,* 24 Cal.2d 200 [148 P.2d 633, 152 A.L.R. 1043] the court held that although

an injured employee could not recover in tort against her employer (who was driving a borrowed car and who negligently drove and injured her employee) because of the compensation act, she could recover in tort from the owner of the automobile, and that then the owner could recover from the employer under section 402, subdivision (d) of the Vehicle Code and the law of bailments. Section 402, subdivision (d) of the Vehicle Code provides that the owner may recover from the negligent operator where the owner is compelled to pay the injured person. In the Baugh case the court stated that the right thus conferred becomes an integral part of every contract of bailment of a motor vehicle in this state. The majority of the court then discussed the precise problem here involved as follows (p. 216):

"There is nothing in the Labor Code which abrogates this obligation imposed on the bailee by the law of bailments. If the owner of a motor vehicle, without fault on his part, suffers a judgment based on the imputed negligence of his bailee, he becomes entitled to recover the amount of that judgment and costs from the negligent bailee. What may have been the relationship between the plaintiff in the original action and the bailee is immaterial in an action between the bailor and the bailee, based exclusively upon their independent, correlative rights and obligations.

"It has been suggested that this holding may tend to impose double liability upon the negligent operator; i.e., liability to his employee for workmen's compensation and to the owner for the amount of the judgment against him arising out of the same injury. But the contention is not sound. The owner will be entitled to have credited on the judgment against him any amount paid by the operator (or his insurance carrier) by way of compensation for the injury, and the amount to be recovered by the bailor-owner from the bailee-operator necessarily will be reduced *pro tanto*."

In the instant case there is no statute comparable to section 402, subdivision (d) of the Vehicle Code applicable, but that statute was used in the Baugh case simply to create a term of the contract of bailment and to provide a remedy for its breach. In the present case we do not need a statute to create the term of the contract. The parties entered into a written contract to wash Hauser windows from a stepladder. Nor do we need a statute to create a remedy. The law of contracts provides a remedy for breach of contract. Thus the case of

*Baugh* v. *Rogers, supra,* seems controlling in the instant case.

The United States Supreme Court has passed on this precise problem in *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Corp.,* 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133]. There a shipowner was required to pay damages to a stevedore injured in the course and scope of his employment. The shipowner was negligent in failing to supply the stevedore with a safe place in which to work. The stevedoring company had a contract with the shipowner. It was negligent in the stowage of the cargo. The shipowner sought reimbursement from the stevedoring company. The court stated the problem as follows (p. 128) : ''The first question is whether the Longshoremen's Compensation Act precludes the assertion by a shipowner of a stevedoring contractor's liability to it, where the contractor is also the employer of the injured longshoreman.'' By a divided court it was held that it did not. The rationale of the majority opinion is that the Compensation Act provides the exclusive remedy of the employee against his employer, but in no way affects the rights of third persons against the employer. The act gives the employee the right to sue third persons, but in nowise limits the rights of third persons to contract with an insurance company or the employer to indemnify the third person in case he is held liable. The reasoning is sound. (See also *Weyerhaeuser Steamship Co.* v. *Nacirema Operating Co.,* 355 U.S. 563 [78 S.Ct. 438, 2 L.Ed.2d 491], decided by a unanimous court and written by one of the dissenting judges in the Ryan case, reaching the same conclusion as the Ryan case.)

Something should also be said about the doctrine of res judicata and the doctrine of collateral estoppel. Are the issues determined in the action by Dubay against the school district, res judicata in this action by the school district against the maintenance company? We think they are, that is, whatever was determined in the prior action is res judicata in the instant case although the maintenance company was not a party to that action.

The leading case on this subject in this state is *Bernhard* v. *Bank of America,* 19 Cal.2d 807 [122 P.2d 892], in which the Supreme Court overruled the older cases holding that the plea of res judicata is available only when there is both privity and mutuality of estoppel. In so doing, Mr. Justice Traynor, the author of the opinion, stated (p. 811): ''The criteria for determining who may assert a plea of res

judicata differ fundamentally from the criteria for determining against whom a plea of res judicata may be asserted. The requirements of due process of law forbid the assertion of a plea of res judicata against a party unless he was bound by the earlier litigation in which the matter was decided. [Citations.] He is bound by that litigation only if he has been a party thereto or in privity with a party thereto. (*Ibid.*) There is no compelling reason, however, for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation.''

At page 813 the court then listed the proper requirements for the plea of res judicata, as follows: ''In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?''

If these tests be applied to the present case it is quite clear that the determination that the school district failed to furnish a safe place in which the window washers were to work is res judicata in the present case.

Thus, we come to the basic problem here involved. The school district, as a matter of law, was negligent in failing to supply a safe place in which Dubay was to work. The maintenance company contracted and agreed to wash the windows in a certain way. The windows were washed in a manner in direct violation of this contract. Was the trial court correct in holding that, as a matter of law, the maintenance company is not liable for damages for breach of its contract, the damages obviously being the amount that the school district was obligated to pay to Dubay and to the workmen's compensation insurance carrier?

The parties argue this question as if the school district and the maintenance company were joint tort feasors, and disagree as to whether an exception to the rule of no contribution between joint tort feasors exists in this case. Both parties agree that on the date of the injury to Dubay—February 6, 1952—the law in California was that there was no right of contribution between joint tort feasors. In 1957 this common law rule was modified in this state by statute (Code Civ. Proc., §§ 875-880), but by express terms the modifying statutes were made applicable only to causes of action ''accruing on or after

January 1, 1958." (Code Civ. Proc., § 880.) These statutes are, therefore, not here involved.

There can be no doubt that the school district and the maintenance company are joint tort feasors. The normal common law rule is that one joint tort feasor cannot seek contribution from the other. The trial court granted the nonsuit in the belief that this doctrine was applicable to the facts here involved.

The rule of noncontribution has some exceptions. In 140 American Law Reports 1306 there is an annotation on the subject "Contribution or indemnity between joint tort-feasors where injury to third person results from violation of a duty which one tort-feasor owes to other." After quoting the general rule of noncontribution the annotation states (p. 1306):

"To these exceptions to the application of the general rule, the courts in a few cases have added another exception to the effect that where the injury which resulted to a third person, as to whom both of the parties were negligent or guilty of a wrongful act, arose from a violation by the defendant of a duty owing by him to the plaintiff, or that where the defendant was a wrongdoer to the plaintiff but the plaintiff was not a wrongdoer to the defendant, although both were liable to the person injured, the plaintiff may recover contribution or indemnity, as the case may be, from the defendant notwithstanding the fact that his negligence also contributed to the third person's injury. [Citations.]

"The cases expressly basing the decision allowing contribution or indemnity upon the ground of a breach by the defendant of a duty owing by him to the plaintiff are rare; but in numerous cases the courts, under facts involving such a duty either in contract or in tort and breach thereof, have reached the same conclusion, without however, basing their decision upon the violation of such duty owing to the plaintiff, but upon some recognized exception to the general rule, as that the parties were not in pari delicto as to each other, or that the negligence of one was primary or direct or active, while that of the other secondary, indirect, passive or constructive."

Numerous cases are cited in support of these rules. Other cases can be referred to. In *Phoenix Bridge Co.* v. *Creem,* 102 App.Div. 354 [92 N.Y.S. 855] (affirmed without opinion, 185 N.Y. 580 [78 N.E. 1110]), a pedestrian was injured. The main contractor was held entitled to be indemnified by the

subcontractor, even though there was no express contract of indemnity. It was contended that the contractor and subcontractor were joint tort feasors. The court held (p. 856): "While there are some expressions in opinions which may seem to give color to the contention stated, I think the general trend of the decisions is adverse, and that the liability which results from the mere omission of a legal duty is to be distinguished, for the purposes of this case, from that which results from personal participation in an affirmative act of negligence, or from a physical connection with an act of omission by knowledge of or acquiescence in it on the part of the original contractor, or by his failure to perform some duty in connection with it which he may have undertaken by virtue of his agreement. In other words, while both the plaintiff and the defendants were equally culpable and equally liable to the traveling public for the omission of duty which resulted in the injury, yet, as between themselves, the plaintiff was entitled to rely upon the defendants to discharge the duty because of their contractual relations, and the former could only be deprived of the right of indemnity by proof that it did in fact participate in some manner in the omission, beyond its mere failure to perform the duty imposed on both by the law."

In *Otis Elevator Co.* v. *Maryland Casualty Co.*, 95 Colo. 99 [33 P.2d 974], an elevator company contracted with the owner of a building to install an elevator and to keep it in repair. It failed to do so. The owner was compelled to pay damages to passengers injured when the elevator fell. The owner was entitled to reimbursement from the elevator company even though the owner had been negligent in failing to inspect the elevator. The court held that the doctrine of joint liability was not applicable for the reason that the failure of the owner to inspect the elevator (p. 977) "would have resulted in no damage, without a primary cause, which was established by competent evidence as the negligence of Otis Company in failing to install the hoisting cables in a careful manner."

Another interesting case is *Seaboard Air Line Ry. Co.* v. *American District Electric Protective Co.*, 106 Fla. 330 [143 So. 316]. There a railroad employee was injured and recovered damages from his employer because of failure to warn the employee of a sagging wire. This wire was negligently maintained by a contractor in violation of its contract with the railroad. The employer was held entitled to reimbursement.

The court stated (p. 316): ''The relation of master and servant and the breach of the master's duty toward the servant with regard to warning him of the negligence of the signal company in leaving in his path a sagging wire gave rise to one kind of liability from the master to the servant. But the negligence of the signal company, in breaching its duty not to let the wire sag to the injury of the railroad company's servants for which the railroad company might become liable, gave rise to tort action by the railroad company against the signal company, not for the breach of the duty which the signal company owed the injured railroad employee, but for a breach of the duty which the signal company owed the railroad company under the contractual relationship which had been brought into existence between them.''

In *Busch & Latta Paint Co.* v. *Woermann Const. Co.*, 310 Mo. 419 [276 S.W. 614], a painting contractor paid damages to its employee when the employee fell from a defective scaffold which the painting company failed to inspect. The painting company was held to be entitled to indemnity from the company that built the scaffold. The court declared (p. 619): ''In all cases where one party creates the condition which causes the injury, and the other does not join therein, but is exposed to liability, and suffers damages on account of it, the rule that one of two joint tort-feasors cannot maintain an action against the other for indemnity does not apply.''

The United States Supreme Court has recently met this problem. It allowed the third person to recover from an employer where the employer, as in the instant case, breached its contract with the third person and an employee was injured. There was no express contract of indemnification between the third person and the employer. The case is *Weyerhaeuser Steamship Co.* v. *Nacirema Operating Co.*, 355 U.S. 563 [78 S.Ct. 438, 2 L.Ed.2d 491], decided in March of this year. In that case a stevedoring firm contracted to furnish the shipowner stevedoring services. In an action by the longshoreman against the shipowner the latter was found to be negligent and damages awarded. The shipowner paid the damages and sought indemnity from the stevedoring company. That is precisely the problem here presented. The court, in an unanimous opinion, held that the shipowner was entitled to indemnity. The reasoning of the court was that the stevedoring company had contracted with the shipowner to furnish stevedoring services; that such a contract necessarily implied an obligation to perform the work involved with reasonable safety

and to discharge foreseeable damages resulting to the ship-owner from the contractor's improper performance. Thus the court found an implied agreement to indemnify. It reasoned that the contractor breached its contract with the shipowner; that such breach foreseeably led to damages being recovered from the shipowner; that under such circumstances the ship-owner "was entitled to indemnity absent conduct on its part sufficient to preclude recovery" (p. 441, 78 S.Ct.); that whether the shipowner's negligence was sufficient to preclude recovery was a jury question. The court also stated (p. 442): "In view of the new trial to which petitioner is entitled, we believe sound judicial administration requires us to point out that in the area of contractual indemnity an application of theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate."

The Supreme Court placed its main reliance on the case of *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.,* 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133], decided, on rehearing, in January of 1956. In that case the shipowner had a contract with a stevedoring firm for stevedoring services. A longshore-man was injured because of faulty stowage of the cargo. He sued the shipowner and recovered $75,000 damages. The ship-owner sought indemnity from the stevedoring firm. After first holding that the Longshoremen's Compensation Act was not a bar to the action, the court held that the contract of the stevedoring company with the shipowner included, by im-plication, a provision to save the shipowner harmless from any damages flowing from a breach of the contract and not flowing from the shipowner's negligence. The court held that the stevedoring firm had contracted to stow the cargo with reason-able safety "and thus to save the shipowner harmless from petitioner's failure to do so." (P. 130.) The court pointed out that if the shipowner had purchased a formal bond of indemnity from an insurance firm, it could clearly recover if the terms of the bond were violated, because such "a liability springs from an individual contractual right. It is not an action by or on behalf of the employee. . . . It is a simple action to recover, under a voluntary and self-sufficient contract, a sum measured by foreseeable damages occasioned to the ship-owner by the injury or death of a longshoreman on its ship." (P. 130.) The court pointed out (p. 131): "The shipowner's action here is not founded upon a tort or upon any duty which the stevedoring contractor owes to its employee. The third-party complaint is grounded upon the contractor's breach of

its purely consensual obligation *owing to the shipowner* to stow the cargo in a reasonably safe manner.''

The court then pointed out that, although both the shipowner and the stevedoring firm owed a duty to the injured stevedore, the action was not based on a violation of that duty but upon the stevedoring company's contractual obligation *to the shipowner*. Thus ''the shipowner's claim here also is not a claim for contribution from a joint tortfeasor.'' (P. 133.) The court stated that the stevedoring company, by necessary implication, contracted to stow the cargo properly and safely— such was ''the essence of petitioner's stevedoring contract.'' (P. 133.) And again ''The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service.'' (P. 134.) The court, on the same page, concluded: ''Petitioner suggests that, because the shipowner had an obligation to supervise the stowage and had a right to reject unsafe stowage of the cargo *and did not do so, it now should be barred from recovery from* the stevedoring contractor of any damage caused by that contractor's uncorrected failure to stow the rolls 'in a reasonably safe manner.' Accepting the facts and obligations as above stated, the shipowner's present claim against the contractor should not thereby be defeated. Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. Respondent's failure to discover and correct petitioner's own breach of contract cannot here excuse that breach.'' (See also *London Guarantee & Accident Co.* v. *Strait Scale Co.*, 322 Mo. 502 [15 S.W.2d 766, 64 A.L.R. 936] ; *American President Lines, Ltd.* v. *Marine Terminals Corp.*, 234 F.2d 753; *Wise Shoes* v. *Blatt*, 107 Pa. Super. 473 [164 A. 89].)

The reasoning of these cases, particularly of the two decided by the United States Supreme Court, is quite convincing. The maintenance company contracted and agreed to wash the Hauser windows from the inside from stepladders. This contract was breached. Stepladders were not furnished to employees, nor were they instructed to use them. The contract also provided that the maintenance company ''is held responsible for payment of any and all damages'' resulting from its

operations. Even if this did not amount to an express contract to indemnify the school district for damages caused to it by a breach of the contract by the maintenance company, such a warranty or agreement to indemnify would necessarily be implied. Whether the school district should be precluded from recovery by reason of its conduct, that is, whether the conduct of the district helped to bring about the damage, is at least a question of fact and should have been left to the jury. Under such circumstances it was error to grant the nonsuit.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 24, 1958.